IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-01567-PAB-BNB

SCOTT WEHRLEY,

      Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

      Defendant.

---

## ORDER

---

This matter is before the Court on the Motion for Summary Judgment [Docket No. 43] filed by defendant American Family Mutual Insurance Company ("American Family"). The motion is fully briefed and ripe for disposition. For the reasons detailed below, the Court grants the motion for summary judgment.

## I. BACKGROUND[1]

This case arises out of plaintiff Scott Wehrley's termination by American Family. Mr. Wehrley worked for American Family from May 3, 1999 until August 28, 2008. He began his employment as a full-time staff agent in the property department and, in October 1999, he became a property claim specialist. As a specialist, Mr. Wehrley's regular duties included evaluating claims and determining the actual value of a potential insurance payment.

---

[1]The following facts, unless otherwise indicated, are not in dispute.

In November 2006, American Family began a process called "reinvention," wherein the company eliminated the specialist position and reorganized duties previously performed by specialists among other departments.  Docket No. 43-2 at 2 (Bourcy Dep. 38:22-25).  Because of the reorganization, American Family relocated former specialists to Des Moines, Iowa or Eden Prairie, Minnesota.  *Id.* (Bourcy Dep. 39:1-5).  Former specialists unwilling to relocate were given the choice to reapply for another position.  Docket No. 43-1 at 5 (Wehrley Dep. 72:9-13).  Mr. Wehrley reapplied and became a Property Claim Field Senior Adjuster ("field adjuster") because he did not want to transfer to Iowa.  *Id.* (Wehrley Dep. 73:19-24).

Over the course of a typical day, field adjusters spend approximately 20% of their time estimating loss and damages; 15% investigating claims, 15% making policy decisions and analysis, 15% negotiating settlements, 10% managing, 10% building agency relationships, 10% working on assignments, and 5% working on homeowner repair programs.  Docket No. 43-3 at 1-3.  Additionally, field adjusters are required to work in high, precarious places between 1% and 33% of the time; have the ability to lift up to 50 pounds between 33% and 66% of the time; and have the ability to climb or balance between 1% and 33% of the time.  *Id.* at 3-4.

On June 20, 2007, during a roof claim investigation for American Family, Mr. Wehrley sustained an injury when he fell off a ladder.  Docket No. 43-2 at 3 (Bourcy Dep. 41:18-42:12).  According to Mr. Wehrley, after examining the roof, he felt lightheaded as he descended the ladder and jumped onto the ground, injuring his knee and back in the process.  Docket No. 58-4 at 3.  After the incident, Dr. George Kohake placed several restrictions on Mr. Wehrley's work duties, such as no climbing ladders,

2

kneeling, squatting, or repetitively lifting over 10 pounds.  Docket No. 43-4 at 1.  Dr.

Kohake also required that Mr. Wehrley use crutches at all times, remain sedentary, and

refrain from climbing stairs or ladders.  *Id*.

Because of Mr. Wehrley's restrictions, Jeffrey Bourcy, Mr. Wehrley's supervisor,

allowed Mr. Wehrley to work from home on non-field claims "until [Mr. Wehrley] could

get up and move around."  Docket No. 43-2 at 3 (Bourcy Dep. 42:18-25).  For a period

of six to eight weeks, Mr. Wehrley worked on desk claims.  Docket No. 43-2 at 4

(Bourcy Dep. 56:22-25).  As soon as Mr. Wehrley was able to walk, he conducted some

field claims which did not require climbing ladders or inspecting roofs.  *Id*. (Bourcy Dep.

56:14-21).

On January 4, 2008, Dr. Christian Updike determined that Mr. Wehrley had

reached Maximum Medical Improvement ("MMI") and removed all work restrictions.

Docket No. 43-5 at 1.  Mr. Wehrley, however, questioned the opinion regarding the MMI

and requested an independent medical examination ("IME").  Docket No. 43-16 at 1, ¶

4.  Despite Mr. Wehrley's reservations about his physical condition, Mr. Wehrley

inspected a roof claim in February 2008.  Docket No. 58-9 at 3 (Wehrley Dep. 127:1-5).

During this inspection, Mr. Wehrley experienced a "leg drag" (an inability to fully extend

and retract one's leg) while descending the ladder.  *Id*.  Mr. Wehrley then called Mr.

Bourcy and told him that he was "uncomfortable" with roof inspections for safety

concerns.  Docket No. 43-2 at 13 (Bourcy Dep. 201:1-10).  Of particular concern for Mr.

Wehrley was the descent from the roofs and ladders after the completion of a claim

inspection.  Docket No. 58-9 at 3 (Wehrley Dep. 127:14-18).

3

Acknowledging Mr. Wehrley's concerns, Mr. Bourcy agreed to limit Mr. Wehrley's roof inspections to those requiring that he "stand up on a ladder" to look at the roof. Docket No. 43-2 at 13 (Bourcy Dep. 201:20-202:7). Mr. Wehrley was not required to perform investigations that would necessitate walking onto a roof. *Id*. On March 24, 2008, American Family requested that Mr. Wehrley provide an IME by May 15, 2008 or it would reinstate Mr. Wehrley to all of his duties. Docket No. 43-7 at 1. Pursuant to this request, Mr. Wehrley underwent an IME on April 16, 2008. *See* Docket No. 43-8. Mr. Wehrley's IME concluded that Mr. Wehrley "should avoid kneeling and crawling whenever possible," although some kneeling and crawling would be acceptable. Docket No. 43-8 at 12. The IME also concluded that Mr. Wehrley's condition was "stable and static and [Mr. Wehrley was] not likely to suffer any sudden increase incapacitation [nor was he] likely to significantly improve in [] function." *Id*. at 13.

Based on the IME, American Family reassigned Mr. Wehrley to roof claims. However, on June 16, 2008, his first roof claim since February 2008, Mr. Wehrley sought additional medical treatment and obtained a medical restriction from climbing ladders and roofs until June 27, 2008. Docket No. 43-9 at 1. On June 27, 2008, Dr. Robert Kawasaki recommended that Mr. Wehrley continue the work restrictions regarding ladders or roofs imposed on June 16, 2008. Docket No. 58-8 at 1-2. Dr. Kawasaki also opined that Mr. Wehrley was no longer at MMI. *Id.* Dr. Kawasaki extended these restrictions on three different occasions: first, he extended the restrictions until July 10, 2008, Docket No. 43-10; second, on July 10, 2008, he extended them for another three weeks, Docket No. 43-11 at 1; and then on July 31, 2008, Dr. Kawasaki determined that Mr. Wehrley showed signs of a symptomatic

4

meniscus, which warranted surgical repair.  Docket No. 58-8 at 5.  Moreover, Dr.
Kawasaki opined that it was "justifiable to keep [Mr. Wehrley] off ladder climbing
activities and avoid work at unprotected heights for safety purposes" without identifying
a time period to remove the restrictions.  *Id.*

Throughout July and August 2008, Mr. Wehrley sought approval from Sentry,
American Family's workers' compensation insurance carrier, for surgery on his knee.
*See* Docket No. 43-2 at 12 (Bourcy Dep. 184:10-186:8).  Mr. Wehrley scheduled a knee
surgery for July 30, 2008; however, Sentry denied approval of his surgery.  Docket No.
43-16 at 2, ¶ 11.  Despite making several calls to reschedule, as of August 28, 2008,
Mr. Wehrley had not scheduled his knee surgery.  Docket No. 43-1 at 6 (Wehrley Dep.
94:13-20).  According to Mr. Wehrley, Mr. Bourcy advised Mr. Wehrley to have his
private insurance provider pay for the surgery.  Docket No. 43-16 at 3, ¶ 14.
Additionally, Mr. Wehrley states that, because he had yet to schedule a surgery, he did
not apply for FMLA leave because he believed that it was not a "germane issue."
Docket No. 43-1 at 6 (Wehrley Dep. 96:12-18).

On August 22, 2008, Mr. Bourcy advised Mr. Wehrley that, if he did not perform
roof claims, his job could be jeopardy.  Docket No. 43-2 at 11 (Bourcy Dep.
170:21-171:11).  According to Mr. Bourcy, "climbing the roofs was an important part of
the job," *id.*, and Mr. Wehrley's inability to perform roof claims meant increasing the
workload for other adjusters.  *Id.* at 5 (Bourcy Dep. 62:19-24).  Additionally, other field
adjusters lodged complaints with Mr. Bourcy because their workload increased as they
drove greater distances to complete Mr. Wehrley's roof claims.  *Id.* at 6 (Bourcy Dep.
66:1-10).

5

Finally, on August 28, 2008, Mr. Bourcy met with Mr. Wehrley and terminated his employment.  Docket No. 43-14 at 1.  Mr. Bourcy advised Mr. Wehrley that inspecting roofs was an essential function of his job and that Mr. Wehrley was terminated because he could no longer perform this function.  *Id*.  Mr. Bourcy noted that since June 20, 2007, Mr. Wehrley had not handled roof claims even after American Family's workers' compensation department had denied his appeals for compensation and removed all of his work restrictions.  *Id*.  According to Mr. Bourcy, American Family waited until August to terminate Mr. Wehrley's employment to allow the appeal process to run its course before making a final determination.  Docket No. 43-2 at 11 (Bourcy Dep. 170:21-171:5).  In the American Family separation form, Mr. Bourcy further indicated that he would rehire Mr. Wehrley if it were for an "inside position, not requiring ladder/roof work."  Docket No. 59-3 at 2.

On June 15, 2010, Mr. Wehrley filed a complaint against American Family in the District Court, City and County of Denver, Colorado.  Docket No. 1-3.  In the complaint, Mr. Wehrley alleged that he was terminated because of his disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*  Mr. Wehrley also claimed that his termination violated both the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615 *et seq.,* and the ADA.[2]  Finally, Mr. Wehrley asserted that he was wrongfully discharged in violation of Colorado's Public Policy Doctrine.

---

[2]Plaintiff voluntarily dropped his claim for discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.  See* Docket No. 77.

On July 1, 2010, American Family removed the action to this Court based on federal question jurisdiction. *See* Docket No. 1. Thereafter, on March 31, 2011, American Family filed its motion for summary judgment. In the motion, American Family argues that the Court should enter summary judgment in its favor because: (1) Mr. Wehrley is not disabled within the meaning of the ADA; (2) Mr. Wehrley's termination was not based on retaliation in violation of the ADA; (3) Mr. Wehrley has not shown that he was wrongfully discharged in violation of public policy under Colorado law; and (4) Mr. Wehrley's termination was not based on retaliation in violation of the FMLA. Docket No. 43 at 20.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works of Colo., Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Board of Regents of the Univ. of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119

F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a

court must view the evidence in the light most favorable to the non-moving party.  *Id.*;

*see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  ANALYSIS

### A.  Discrimination in Violation of the  ADA

The ADA provides that "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and

other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In

cases such as this, where a plaintiff seeks to establish an ADA violation through

circumstantial evidence, the Court applies the burden-shifting framework outlined in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Johnson v. Weld Cnty.,*

*Colo.,* 594 F.3d 1202, 1217 (10th Cir. 2010); *MacKenzie v. City and Cnty. of Denver*,

414 F.3d 1266, 1274 (10th Cir. 2005).  Accordingly, Mr. Wehrley must first establish a

prima facie case of discrimination, showing a genuine issue of material fact exists on

each of three points: (1) he is a disabled person as defined by the ADA; (2) he is

qualified, with or without accommodation, to perform the essential functions of the job

held or desired; and (3) his employer discriminated against him because of his

disability.  *See Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 897 (10th Cir. 1997);

*Zwygart v. Bd. of Cnty. Comm'rs of Jefferson Cnty. Kan.*, 483 F.3d 1086, 1090 (10th

Cir. 2007).[3]  If Mr. Wehrley can establish a prima facie case of discrimination, then

---

[3]The ADA was amended on September 25, 2008; however, the amendments
became effective on January 1, 2009.  ADA Amendments Act of 2008 (ADAAA"), Pub.

American Family must offer non-discriminatory reasons for its employment decision. *MacKenzie*, 414 F.3d at 1274.  Should American Family articulate a non-discriminatory reason, the burden shifts back to Mr. Wehrley to show a genuine issue of material fact as to whether American Family's reason for discharge is pretextual.  *Id*.

Under the ADA, an individual is considered "disabled" if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded by his employer as having such an impairment.  42 U.S.C. § 12102(1); *see Lanman v. Johnson Cnty., Kansas*, 393 F.3d 1151, 1156 (10th Cir. 2004).  Mr. Wehrley does not contend that he has a record of a physical impairment that substantially limits one or more of his major life activities, nor does he argue that American Family regarded him as having such an impairment.  *See* Docket No. 58.  Accordingly, the Court's inquiry focuses on whether Mr. Wehrley has an impairment that substantially limits a major life activity.

The ADA does not define physical or mental impairments.  In assessing whether an individual has a physical or mental impairment that substantially limits one or more major life activities, courts follows a three-step process.  *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).  First, plaintiff must have a

---

L. 110-325, 122 Stat. 3553 (2008).  Numerous courts have determined that the amendments do not apply retroactively.  *See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1261 n.2 (10th Cir. 2009) (unnecessary to consider the effect of the ADA amendments because the challenged conduct took place prior to the amendments taking effect); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1143 (10th Cir. 2011) (ADAAA does not operate retroactively); *LaBrue v. Gab Robins N. Am., Inc.*, 2009 WL 2355785, at *4 (D. Kan. July 29, 2009) (collecting case).  In this case, the conduct at issue occurred before the effective date of the ADAAA.  Accordingly, the Court will not consider those amendments for the purposes of this motion.

recognized impairment; second, plaintiff must identify one or more appropriate major

life activities; and third, plaintiff must show that the impairment substantially limits one

or more of those activities. *Id*. Additionally, plaintiff must articulate with precision the

impairment alleged and the major life activity affected by that impairment, and the court

is to analyze only those activities identified by plaintiff. *Poindexter v. Atchison, Topeka

& Santa Fe Ry. Co.*, 168 F.3d 1228, 1231-32 (10th Cir. 1999). Whether plaintiff has an

impairment within the meaning of the ADA is a question of law for the court to decide.

*Id*. at 1230.

A regulation promulgated by the Equal Employment Opportunity Commission in

effect when Mr. Wehrley's employment was terminated defines impairments under the

ADA as "[a]ny physiological disorder, or condition . . . affecting one or more of the

following body systems: neurological, musculoskeletal, special sense organs,

respiratory (including speech organs), cardiovascular, reproductive [or] digestive." 29

C.F.R. § 1630.2(h)(1) (2007) (amended 2011). Mr. Wehrley alleges that the injury he

sustained to his knee constitutes a physical impairment. Docket No. 58 at 9. For the

purposes of the current motion, the Court assumes Mr. Wehrley's knee injury qualifies

as a physical impairment. However, establishing a recognized impairment does not

satisfy Mr. Wehrley's burden. Mr. Wehrley must also prove that his impairment

substantially limits his ability to participate in a major life activity. *See Williams v. Kerr-

McGee Corp.*, 1997 WL 158176 (10th Cir. Apr. 1, 1997) (noting that it is not enough

merely to list impairments; rather, a plaintiff must prove that the impairments limit one or

more major life activities).

A "major life activity" is a basic activity that the average person in the general population can perform with little or no difficulty. *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1199 (D. Kan. 2006). Major life activities as defined by the ADA are functions such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see Poindexter*, 168 F.3d at 1231 (noting that the list provided by the ADA is merely illustrative). Although the ADA uses broad language to define major life activities, the Supreme Court has interpreted a major life activity "strictly," holding that the definition "refers to those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.

Mr. Wehrley contends that his physical limitations affect his ability to perform household tasks such as kneeling, crawling, lifting more than 25 pounds on a regular basis, climbing ladders, changing light bulbs, and other household chores. Docket No. 58 at 9. Additionally, Mr. Wehrley asserts that he can no longer perform recreational activities he once enjoyed, such as skiing, waterskiing, golfing, camping, hiking and fishing. *Id*. Mr. Wehrley claims that these restrictions are far greater than those of an average person in the general population. *Id*. The Court disagrees. *See* 42 U.S.C. § 12102(1)(A); *cf. Johnson*, 594 F.3d at 1218 ("An impairment is substantially limiting when it renders an individual either unable or significantly restricted in [his] ability to

perform a major life activity 'compared to the average person in the general population.'").

The inquiry into whether an employee's impairments substantially limited a major life activity is governed by an analysis of: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; (3) the permanent or long term impact; and (4) the expected permanent or long term impact of the impairment. *Carter*, 662 F.3d at 1145.  Because this is a factual determination, *see Doebele*, 342 F.3d at 1129, the relevant question for the purposes of this case is whether Mr. Wehrley has presented enough evidence to create a genuine dispute as to any material fact that necessitates resolution by a jury.

First, activities such as skiing, waterskiing, golfing, camping, hiking, and fishing do not constitute major life activities as these are not of "central importance to daily life." *See Williams*, 534 U.S. at 197; *Faroh v. Sedgwick Cnty.*, 2002 WL 1627701, at *3 (D. Kan. July 12, 2002) (finding that "mountain biking, weight lifting, and roller blading are not major life activities").  Second, although the tasks identified by Mr. Wehrley–lifting more than 25 pounds on a regular basis, kneeling, crawling, climbing ladders, cleaning, and carrying out household chores–meet the definition of major life activities, *see Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1143 (10th Cir. 2011) (finding that carrying out personal and household chores meet the ADA definition of major life activities), the record is devoid of any evidence that Mr. Wehrley's impairments substantially limit his ability to perform these tasks.

Mr. Wehrley claims Dr. Linda Mitchell's recommendation that he permanently refrain from lifting 25 pounds qualifies as a substantial limitation to a major life activity. Docket No. 58 at 9.  However, this recommendation is derived from an IME performed on February 11, 2010, more than a year after Mr. Wehrley's termination from American Family.  *See* Docket No. 58-4 at 17; *see also* Docket No. 58-12 at 17 (noting that Dr. Updike approved plaintiff lifting up to 50 pounds on October 6, 2009).  Plaintiff does not provide evidence showing that a treating physician imposed a permanent restriction on his lifting capacity during his employment with American Family.  Moreover, Mr. Wehrley provides no evidence showing that a permanent restriction on his ability to lift 25 pounds substantially limits a major life activity when compared to the average person in the general population.  *See Doebele*, 342 F.3d at 1130; *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240 (10th Cir. 2001) (finding that a twenty-five pound lifting restriction on its own was not enough to show that the restriction substantially limited major life activity).  Limitations on the ability to engage in life activities, such as lifting heavy objects, are part of the human condition, and unless an ADA plaintiff can show that his impairment reduces his capabilities significantly below those of the average person, he is not deemed "disabled" under the Act.  *Velarde v. Associated Reg'l & Univ. Pathologists*, 61 F. App'x 627, 629 (10th Cir. 2003) (noting that a plaintiff "must present 'evidence comparing [his] . . . restrictions to that of an average person.'"); *McCoy v. USF Dugan, Inc.*, 42 F. App'x 295, 297 (10th Cir. 2002) (an "inability to lift heavy objects does not constitute a substantial limitation on a person's overall ability to lift").

13

Mr. Wehrley further contends that he is substantially limited in his ability to perform household chores because Dr. Mitchell recommended that he permanently refrain from squatting, kneeling, crawling, climbing ladders, or working at unprotected heights.  Docket No. 58 at 9.  However, plaintiff fails to present any evidence in support of this contention.  Mr. Wehrley cites no evidence regarding the extent of his limitations, or how much these limitations affect his ability to perform each activity, or why these restrictions are "substantial."  Merely asserting that one is "restricted" or "limited" is not enough to prove disability under the Act.  "Unless an ADA plaintiff can show that his impairment reduces his capabilities significantly below those of the average person, he is not deemed 'disabled' under the Act."  *Velarde*, 61 F. App'x at 629; *cf. Buettner v. North Okla. Cnty. Mental Health*, 2004 WL 3623405, at *13 (W. D. Okla. Nov. 8, 2004) (walking, sitting, standing, sleeping "moderately below average" is not a disability under the ADA).  In this regard, because of the lack of evidentiary support, Mr. Wehrley has failed to show that these restrictions substantially limit his ability to perform household chores.

Mr. Wehrley also argues that pain regularly disrupts his sleep during the night.  Docket No. 58 at 9.  The Tenth Circuit recognizes sleeping as a major life activity.  *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254 (10th Cir. 2001).  Mr. Wehrley, however, has not demonstrated that his sleeping difficulties have been "severe, long term, or ha[ve] a permanent impact."  *Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999).  His own expert's synopsis of his medical records between June 27, 2007 and May 25, 2010 shows just one reference to sleep problems.  Docket No. 58-12 at 5-19.  On April 9, 2009, Dr. Updike noted that Mr. Wehrley "would wake occasionally in the

night due to 'zingers' in his leg." *Id*. at 15.  However, such sleep problems were "occasional" and may have related to his back, not his knee.  *Id*. at 18 (Dr. Kawasaki associates "shooters" down Mr. Wehrley's left leg with back pain on February 11, 2010). Plaintiff does not assert that he has requested sleeping aids or that he has been prescribed medication.  Accordingly, this assertion regarding sleep disruption fails to qualify as a substantial limitation to a major life activity.

Moreover, to the extent Mr. Wehrley argues that he had restrictions similar to those imposed by Dr. Mitchell for the last four years, *see* Docket No. 58 at 10, the Court is not persuaded.  The evidence in the record unequivocally shows that Mr. Wehrley's restrictions were adjusted several times during the relevant time period.  For example, after Mr. Wehrley's accident on June 20, 2007, his restrictions included not climbing ladders, kneeling, squatting, or lifting over 10 pounds.  Docket No. 43-4 at 1.  On January 4, 2008, Dr. Updike removed all of Mr. Wehrley's work restrictions, concluding he had reached MMI.  Docket No. 43-5 at 1.  On April 16, 2008, the independent IME restricted some, but not all, of Mr. Wehrley's kneeling and crawling and noted that he was otherwise "stable and static."  Docket No. 43-8 at 13.  Additionally, although Dr. Kawasaki found that Mr. Wehrley was no longer at MMI, he only limited Mr. Wehrley from "climbing activities and [] work at unprotected heights."  Docket No. 58-8 at 5.  Mr. Wehrley fails to provide evidence showing that his current restrictions–no kneeling, no crawling, and no exposure to whole body vibrations–substantially affected a major life activity.

Viewing the evidence in a light most favorable to Mr. Wehrley, the evidence establishes that Mr. Wehrley's restrictions substantially limited his ability to climb

ladders or perform work at unprotected heights.  However, climbing ladders and performing work at unprotected heights are not "major life activities."  *See Otting v. J.C. Penney Co.*, 223 F.3d 704, 710 (8th Cir. 2000) (ladder climbing is not a major life activity under the ADA); *Elstner v. Southwestern Bell Tel. Co.*, 659 F. Supp. 1328, 1343 (S. D. Tex. 1987) *aff'd*, 863 F. 2d 881 (5th Cir. 1988) (while employee's knee problem constituted an impairment, it did not substantially limit his major life activities in that it only limited his ability to work at jobs requiring pole climbing).

Finally, to the extent that Mr. Wehrley's arguments can be construed as asserting that his inability to climb ladders or work at unprotected heights affects his major life activity of working, the Supreme Court has signaled its reluctance to rule that work is a major life activity. *Williams*, 534 U.S. at 200.  "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum that [plaintiff] allege [that he was] unable to work in a broad class of jobs" at the time he was terminated.  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.  Even if the Court assumed that work is a major life activity, Mr. Wehrley has not produced evidence showing an inability to perform a broad range of work.

The record in this case is not sufficient to allow a reasonable jury to determine that Mr. Wehrley is substantially limited in any of his asserted major life activities. Accordingly, the Court concludes that Mr. Wehrley has failed to raise a genuine issue of fact as to whether he satisfies the ADA's definition of "disability" in 42 U.S.C.

§ 12102(1)(A).  Mr Wehrley therefore fails to establish a prima facie case of discrimination under the ADA.

### B.   Retaliation Under the ADA

The ADA prohibits retaliation against any individual "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203.  In order to establish a prima facie case of retaliation under the ADA, Mr. Wehrley must demonstrate that: (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the material adverse action.  *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011).  In the absence of direct evidence of retaliation, an ADA retaliation claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).

Mr. Wehrley asserts American Family terminated his employment because he requested an accommodation for his alleged disability.  Docket No. 58 at 19.  Mr. Wehrley contends that the temporal proximity between his request for an accommodation and his termination is circumstantial evidence that he was terminated in retaliation for asserting a protected right.  *Id*.  Mr. Wehrley claims that he engaged in statutorily protected activity on June 27, 2008, when he presented American Family with Dr. Kawasaki's report that he was no longer at MMI.  *Id*.  Mr. Wehrley argues that,

17

because Dr. Kawasaki's recommendation showed his resulting limitations, this alone was sufficient to alert American Family that he desired an accommodation.  *Id.*  Mr. Wehrley also claims that his communication to Mr. Bourcy that he would do "whatever it takes" to remain with the company evidences a request for an accommodation.  Docket No. 43-16 at 3, ¶ 14.

Because the Court has found that Mr. Wehrley is not disabled within the meaning of the ADA, the Court must determine whether the ADA allows a non-disabled employee to bring a claim for retaliation for failure to accommodate.  The Tenth Circuit has held that, under the ADA, a plaintiff need not show that he suffers from an actual disability to assert a retaliation claim; instead, the plaintiff need only show that he had a reasonable good faith belief that the ADA had been violated.  *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001).  Here, the Court finds that the evidence in the record does not support an inference that Mr. Wehrley had a good faith belief that he had a legal right to an accommodation because of a disability.

Throughout his deposition, Mr. Wehrley discussed his limitations in terms of his inability to ascend and descend ladders.  *See e.g.*, Docket No. 43-1 at 8 (Wehrley Dep. 105:14-18) (acknowledging that he did not "have an issue with ascending a ladder.  [He] had] an issue with descending the ladder."); *see also* Docket No. 43-1 at 8 (Wehrley Dep. 102:6-10) (stating that "[i]t's not my belief.  It's my knowledge . . . going from the ladder . . . with the leg drag that I have, it would be a matter of time [before another injury]."); Docket No. 43-1 at 7 (Wehrley Dep. 101:23-25) (noting that more important than his doctors' recommendation that he stay away from unprotected heights, was his own "know[ledge] that in – in your words, he [could] become a lawn ornament at some

18

point descending the roof."). He admits that he is able to climb up ladders, Docket No. 43-1 at 8 (Wehrley Dep. 105:14-18), and walk a quarter of a mile at a time. Docket No. 58 at 9. Mr. Wehrley does not argue that his knee injury affected other work activities such as being unable to drive to and from inspection sites or performing field inspections that did not require climbing on roofs. The Court concludes that no reasonable jury could find that, in June 2007, Mr. Wehrley had a reasonable, good faith belief that simply because he could not descend a ladder he was disabled within the meaning of the ADA. Without such a good faith belief that he was disabled, Mr. Wehrley could not have engaged in protected activity.

Even if the Court assumes Mr. Wehrley had a good faith belief that he was disabled, Mr. Wehrley nevertheless fails to establish a claim for retaliation. This is true despite the fact that Mr. Wehrley has established a prima facie case of retaliation. To establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate that: (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the material adverse action. *E.E.O.C.*, 644 F.3d at 1051. A good faith request for an accommodation can constitute protected activity under the ADA. *See Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) ("We now hold that requesting an accommodation is protected activity for the purposes of [the ADA]."); *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1191 (D. Kan. 2006) (a request for accommodation can constitute protected activity under the ADA); *Coleman v. Blue Cross Blue Shield of Kan.*, 487 F. Supp. 2d 1225, 1253 (D. Kan. 2007) (same). Additionally, Mr. Wehrley's termination qualifies as

19

an adverse employment action.  *See Anderson*, 181 F.3d at 1178 (noting that an

employment action is considered "adverse" only if it results in some tangible, negative

effect on the plaintiff's employment).  Moreover, because Mr. Wehrley provided Dr.

Kawasaki's recommended restrictions to defendant on June 16, 2008 and was

terminated on August 28, 2008, the temporal proximity of two months is sufficient to

show a causal connection between the protected activity and his termination.  *See Argo*

*v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (holding

that twenty-four days between protected activity and termination is sufficient to infer

existence of causal connection); *but see Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209

(10th Cir. 1997) (finding that a time period of three months is, by itself, insufficient to

establish causation).

Mr. Wehrley's retaliation claim, however, fails because the record is devoid of

evidence to rebut American Family's non-discriminatory reason for its action.  *See*

*Selenke*, 248 F.3d at 1264.  American Family claims that its decision to terminate Mr.

Wehrley was based on Mr. Wehrley's inability to perform essential functions of his

employment: climbing ladders and performing roof inspections.  Docket No. 43 at 19.

According to American Family, Mr. Bourcy made it clear to Mr. Wehrley that his inability

to perform roof claims placed his job in jeopardy.  Docket No. 43-2 at 11 (Bourcy Dep.

170:21-171:16).  Additionally, Mr. Wehrley's inability to complete roof claims led to

complaints from other field adjusters at the company because of increased workloads.

*Id*. at 6 (Bourcy Dep. 66:1-10).  Because American Family's stated reasons qualify as

non-discriminatory reasons for its actions, Mr. Wehrley must show that there is a

genuine dispute of material fact as to whether American Family's stated reasons are pretextual. *See Selenke*, 248 F.3d at 1264. However, Mr. Wehrley fails to meet this burden.

Mr. Wehrley does not rebut American Family's assertion that he could not perform essential functions of his employment. In fact, Mr. Wehrley admits that he could not climb ladders and could not perform roof claims. Docket No. 43-1 at 8 (Wehrley Dep. 102:6-10) ("I know for a fact . . . going from the roof to the ladder with the leg drag that I have, it would just be a matter of time [before another injury]."). Although Mr. Wehrley argues that climbing ladders and roofs is not an essential function of a field adjuster, the description of a field adjuster's duties suggests otherwise. For example, field adjusters are required to have the ability to climb or balance between 1% and 33% of the time; work in high, precarious places between 1% and 33% of the time; and have the ability to lift up to 50 pounds between 33% and 66% of the time. Docket No. 43-3 at 1-4. Thus, climbing ladders and roofs "bears more than a marginal relationship to the job at issue." *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995).

Moreover, Mr. Wehrley's assertion that American Family terminated his employment because he requested an accommodation is not supported by the record. On the contrary, the evidence reflects that American Family consistently accommodated Mr. Wehrley. Since June 20, 2007, American Family was receptive to temporary accommodations for Mr. Wehrley's injury. Directly after his accident in June 2007, American Family allowed Mr. Wehrley to perform desk claims for six weeks until he was able to walk. Docket No. 43-2 at 4 (Bourcy Dep. 56:22-25). American Family

also permitted Mr. Wehrley to perform field claims that did not require climbing ladders or inspecting roofs until Dr. Updike found that Mr. Wehrley reached MMI on January 4, 2008.  Docket No. 43-5 at 1.  Additionally, after Mr. Wehrley's incident in February 2008, American Family again relieved Mr. Wehrley of climbing ladders until he underwent an IME.  Docket No. 43-7 at 1.  Mr. Wehrley was not assigned to another roof claim until June 16, 2008, almost a year after his fall.  Docket No. 43-9 at 1.  Even on June 16, 2008, American Family was willing to accommodate Mr. Wehrley after he presented Dr. Kawasaki's report recommending that Mr. Wehrley not climb roofs or ladders.  Furthermore, American Family accommodated Mr. Wehrley's restrictions from Dr. Kawasaki until August 28, 2008.  This evidence contradicts the inference that American Family had a motive to retaliate against Mr. Wehrley.

Mr. Wehrley was terminated on August 28, 2008 which was two months after Dr. Kawasaki's first report on June 16, 2008; approximately 14 months since Mr. Wehrley's last successful roof inspection; and 28 days after Sentry rejected Mr. Wehrley's request to cover his knee operation.  Based on this evidence, it was reasonable for American Family to believe that, after accommodating Mr. Wehrley for a period of 14 months, he would be unable to perform an essential function of his position.

Thus, because Mr. Wehrley has failed to raise a genuine question of material fact to support a claim of retaliation under the ADA, American Family is entitled to summary judgment on this claim.

### C.   Violation of Colorado's Public Policy

The Workers' Compensation Act of Colorado is "designed to provide an employee, who is injured in the course and scope of his employment, medical treatment

22

and compensation for the temporary and permanent loss of income resulting from the employee's temporary or permanent disability." *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367, 1372 (Colo. App. 1989) (citing Colo. Rev. Stat. §§ 8-40-101 through 8-66-112). Colorado courts have recognized that an employee may assert a public policy common law claim alleging discharge on the basis of filing a workers' compensation claim. *Id.*  In *Lathrop*, the Colorado Court of Appeals held that "since an employee is granted the specific right to apply for and receive compensation under the [Workers' Compensation Act of Colorado], an employer's retaliation against such an employee for his exercise of such right violates Colorado's public policy." *Id.* at 1373.  "[T]he violation of such public policy provides the basis for a common law claim by the employee to recover damages." *Id.*

For a plaintiff to assert a public policy claim for retaliatory discharge in the exercise of a job-related right, such as workers' compensation benefits, the plaintiff must show: (1) that he was employed by the defendant; (2) the defendant discharged the plaintiff; and (3) the plaintiff was discharged for exercising a job-related right or privilege to which he was entitled.  *Baros v. Advantage Logistics USA West, LLC,* 09-cv-00012-CMA-BNB, 2010 WL 1416812, at *6 (D. Colo. April 8, 2010).  The first two elements of this claim are undisputed; thus, in order to survive summary judgment, Mr. Wehrley must "present evidence that [his] termination was causally connected to [his] filing for benefits under workers' compensation." *Id.* (citation omitted).

Mr. Wehrley contends that he was terminated because he repeatedly challenged the determination of Sentry, the workers' compensation insurance company, and Dr.

Updike, the workers' compensation physician.  Docket No. 58 at 17.  Mr. Wehrley

claims that, after Sentry refused to pay for his surgery, he asked Mr. Bourcy for help in

securing Sentry's approval for surgery.  Docket No. 58 at 17.  Mr. Wehrley states that,

instead of providing help, Mr. Bourcy urged him to use his private insurance company to

pay for the surgery and terminated his employment a week later.  *Id*.  According to Mr.

Wehrley, the temporal proximity between the request for aid and his termination creates

a causal connection showing that he was terminated because he challenged Sentry's

determination.  Docket No. 58 at 18.

The Court finds that Mr. Wehrley fails to prove a link between his termination

from American Family and his challenge of Sentry's denial of coverage.  To prove

causation, Mr. Wehrley relies primarily on two pieces of evidence: first, the proximity in

time between his request for aid and his termination; and second, the fact that Sentry

approved the surgery in January 2009.  Docket No. 58 at 17-18.  However, Mr.

Wehrley's request for aid in August 2008 was not the first time he appealed a workers'

compensation determination.  Mr. Wehrley had repeatedly challenged workers'

compensation claims since December 21, 2007 when Dr. Kawasaki determined that Mr.

Wehrley had reached MMI.  Docket No. 43-16 at 1, ¶ 4.  Thus, contrary to plaintiff's

arguments, the relevant time frame under which to analyze Mr. Wehrley's challenge to

a workers' compensation determination begins in December 2007 and not August

2008.  As such, a period of nine months between the protected activity and Mr.

Wehrley's termination undermines his conclusion that his termination was retaliatory.

*See ONEOK,* 120 F.3d at 209 (finding a three month period between protected activity

and adverse employment action, standing alone, insufficient to establish causation).

Moreover, the fact that Sentry decided to cover plaintiff's surgery does not refute American Family's purported reason for Mr. Wehrley's termination.  By the date of Mr. Wehrley's termination, American Family had given plaintiff nine months to contest the Workers' compensation determination that he reached MMI, and plaintiff cites no authority to suggest that American Family was required to wait any longer simply because he disagreed.  Additionally, Mr. Werhley does not cite any authority suggesting that the right to apply for workers' compensation benefits protects an employee from termination until the conclusion of an indefinite appeal process.

As noted above, Mr. Wehrley fails to provide evidence rebutting American Family's purported reason for terminating his employment.  In this case, no reasonable jury could find that plaintiff's termination was retaliatory, given that plaintiff was employed for more than a year following his injury and more than nine months after his first challenge of the workers' compensation determination.  In this regard, Mr. Wehrley has not shown that American Family engaged in retaliatory conduct or interfered with his workers' compensation filings.  *See Baros*, 2010 WL 1416812, at *8 ("Termination due to a worker's exercise of his rights is distinct from termination due to an inability to do the work").

Based on the facts in the record before the Court, no reasonable jury would find that American Family terminated plaintiff in retaliation for his workers' compensation filings.  Therefore, American Family is entitled to summary judgment on this claim.

### D.   Retaliation Under the FMLA

The FMLA makes it unlawful for any employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by"

subchapter I of the FMLA.  29 U.S.C. § 2615(a)(2).  Under the FMLA, employees are entitled to up to twelve weeks of unpaid leave in any twelve-month period if: (1) they are employed by an employer who meets the statutory criteria listed in 29 U.S.C. § 2611(4); and (2) have been employed by that employer for at least twelve months preceding their request for leave.  *See* 29 U.S.C. § 2614(a)(4).  Neither party contends that Mr. Wehrley failed to meet these prerequisites.  The FMLA protects an employee's leave only: (1) for the birth of and to care for a child; (2) for the adoption or assumption of foster care of a child; (3) to care for an immediate family member suffering from a serious health condition; or (4) for the employee's own serious health condition, which makes it impossible for him or her to work.  29 U.S.C. § 2612(a)(1).

FMLA claims are typically litigated under two separate theories: the retaliation theory or the interference theory.  *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).  Because Mr. Wehrley asserts a claim under the retaliation theory, the court need not discuss the interference theory.[4]  The retaliation theory provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).  Retaliation claims under the FMLA are subject to the *McDonnell Douglas* burden-shifting analysis.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).  To make out a prima facie case of retaliation under the FMLA a plaintiff must show that: (1) he engaged in a protected

---

[4]Mr. Wehrley's Response to the Motion for Summary Judgment [Docket No. 58], includes a footnote wherein Mr. Wehrley indicates that he will seek leave to amend the complaint to plead an interference claim under the FMLA.  Docket No. 58 at 18 n. 2. Mr. Wehrley, however, has not done so.

activity under the FMLA; (2) his employer took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.  *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).

Mr. Wehrley claims that American Family terminated his employment because he expressed an intent to exercise his FMLA rights, namely, to apply for leave under the FMLA.  Docket No. 58 at 18.  Mr. Wehrley advised American Family that he would apply for FMLA leave once he received a notice from Sentry granting coverage for his knee surgery.  *Id*.  However, Sentry denied approval of the surgery and Mr. Wehrley never applied for FMLA leave before his termination.  Docket No. 43-1 at 6 (Wehrley Dep. 96:12-18).  He did not think applying for leave was a "germane issue" and had yet to schedule surgery by the time of termination.  *Id*.  Despite his failure to apply for FMLA leave, Mr. Wehrley asserts that his intent to apply, and American Family's knowledge of that intent, qualifies as protected activity under the FMLA.  Docket No. 58 at 18.  He then claims that the temporal proximity between expressing his intent to use FMLA leave and his termination is circumstantial evidence that American Family terminated him in retaliation for participating in protected activity.  The Court finds Mr. Wehrley's arguments unavailing.

Tenth Circuit law is unsettled as to whether an employee must actually have taken FMLA leave as a prerequisite to a retaliation claim.  *See Treat v. Am. Furniture Warehouse, Co.,* No. 06-cv-02029-EWN-MEH, 2008 WL 501442, at *9 (D. Colo. Feb. 21, 2008).  Nonetheless, the Tenth Circuit reads its own precedent to "prefigure the conclusion that the lawful taking of FMLA leave is a prerequisite to a retaliation claim."

27

*See Wilkins v. Packerware Corp.*, 260 F. App'x 98, 103 (10th Cir. 2008). Thus, an employee cannot claim protection under the FMLA merely by asserting that he or she wishes to take FMLA leave. *Id*. At a minimum, the Tenth Circuit holds in analogous ADA cases that to satisfy the first element of a retaliation claim the employee must have a "reasonable, good faith belief that the statute has been violated." *Selenke*, 248 F.3d at 1264.

The undisputed facts show that, as of August 28, 2008, Mr. Wehrley had not applied for or been granted FMLA leave. Docket No. 43-1 at 6 (Wehrley Dep. 96:12-18). Because Mr. Wehrley did not actually take leave, he could not undertake protected activity under the FMLA. *See Wilkins*, 260 F. App'x at 104 (finding that, to claim retaliation, a plaintiff needs to lawfully take FMLA leave as a prerequisite). Therefore, Mr. Wehrley fails to satisfy the first element of his retaliation claim.

In the alternative, the Court also finds that there is no genuine issue of material fact as to the third element, whether American Family's termination of Mr. Wehrley's employment was related to Mr. Wehrley's intent to file for FMLA benefits. The evidence shows that: (1) Mr. Bourcy referred Mr. Wehrley to American Family's FMLA coordinator in order "discuss FMLA possibilities," Docket No. 58-16 at 1; and (2) Sentry, the workers' compensation carrier, subsequently denied Mr. Wehrley's request to pay for the knee surgery. Docket No. 43-16 at 2, ¶ 11. Thus, American Family assisted Mr. Wehrley in making an FMLA request but, due to Sentry's refusal to pay for surgery, Mr. Wehrley never actually made his FMLA request.

The evidence shows that Mr. Wehrley's termination occurred at the culmination of a year-long process wherein American Family aided Mr. Wehrley in his desire to

return to his full duties as a field adjuster.  The evidence also shows that American

Family terminated Mr. Wehrley because it believed Mr. Wehrley could not perform the

essential functions of his employment.  The separation form even indicated that Mr.

Bourcy would rehire Mr. Wehrley for an inside position that did not require climbing

ladders.  Docket No. 59-3 at 2.  None of these things suggest a causal connection

between his notification to American Family that his doctor recommended knee surgery

and his termination of employment.

Finally, Mr. Wehrley's reliance on the temporal proximity between his termination

and his intent to take leave in the indefinite future is not enough to survive summary

judgment.  *See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998)

("an employee who requests FMLA leave would have no greater protection against his

or her employment being terminated for reasons not related to his or her FMLA request

than he or she did before submitting the request.").

For the reasons stated above, the Court finds that Mr. Wehrley has not raised a

genuine issue of material fact to show retaliation under the FMLA.  Therefore, American

Family is entitled to summary judgment on this claim.

## IV.  CONCLUSION

Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 43] is

**GRANTED**.  It is further

**ORDERED** that the Trial Preparation Conference scheduled for February 10,

2012 and the trial set for February 21, 2012 are hereby **VACATED**.

DATED February 9, 2012.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge